Gloria KITZMANN, Plaintiff
and Appellant,

v.

James KITZMANN, Defendant
and Appellee.

Civ. No. 890378.

Supreme Court of North Dakota.

July 31, 1990.

---

Ann Mahoney of Mahoney & Mahoney, Center, for plaintiff and appellant.

Daniel J. Chapman of Chapman & Chapman, Bismarck, for defendant and appellee.

VANDE WALLE, Justice.

Gloria Kitzmann appealed from a judgment of divorce entered in the district court for Morton County. On appeal, Gloria contends that the findings of fact of the trial court were clearly erroneous resulting in an inequitable distribution of the property of the parties, and that the trial court erred in failing to grant her attorney's fees. We affirm in part, and remand for further proceedings consistent with this opinion.

James and Gloria Kitzmann were married on June 16, 1967, in New Salem, North Dakota. The parties have two children, both of whom are now adults.

At the time of their marriage, Gloria was employed as a clerical worker in Mandan, North Dakota. James had recently been discharged from the United States Navy and was working with his parents on their family farm located in Oliver County. After the wedding, Gloria terminated her employment and the parties moved into a vacant building on the farm owned by James's parents. James and Gloria did extensive work on the building and eventually converted it into their residence.

During their marriage, the parties acquired a marital estate consisting primarily of farmland, farm equipment, and livestock. The farmland, approximately 600 acres, was purchased from James's parents pursuant to two contracts for deed at generally favorable prices and interest rates. The Kitzmanns raised grain and cattle during most of their marriage, but moved from a cattle to a sheep operation in late 1988.

The income of the parties from the farm could be characterized as modest and, on occasion, James and Gloria would work outside the farm to meet expenses. At various times during the marriage, James worked as a union carpenter at local power plants. In 1987, Gloria obtained employment as a licensed insurance agent in New Salem. Both parties readily acknowledge each other's joint efforts and contributions to the farm operation.

Gloria is currently employed as an insurance agent, and James is working on a full-time basis on the farm. Each party is in good physical health, although James had twice sought treatment for depression during the couple's marriage.[1]

This case was commenced on March 7, 1989, when Gloria served James with a summons and complaint alleging irreconcilable differences. During trial, Gloria testified that she was tired of farm life and of James's dictatorial manner produced by his periods of depression. Gloria also testified that she was not interested in receiving the farmland in a property division. She noted that if James desired to continue farming, she would not want the farm sold and the proceeds from the sale divided, but would rather receive some other form of equitable compensation in the property division. Gloria further testified as to her current income and expenses as well as to numerous items of personal property that she wished to retain out of the marital estate. James testified that he wanted to continue farming, and that he would need farm equipment and certain other marital property in order to maintain the farm. Evidence was presented by both parties regarding the valuation of their marital property and debts by means of a Rule 8.3, NDROC, property listing and in-court testimony.

Each party also submitted into evidence expert testimony and certified appraisals regarding the value of the farmland and buildings.

After the hearing, the trial court issued its Findings of Fact, Conclusions of Law and Order for Judgment. The court entered a number of findings regarding the value of the marital property. It found that the parties had total marital assets of $226,194, total marital debts of $16,482, and a resulting net marital estate of $209,712. In making its property division, the trial court awarded Gloria numerous specific pieces of property with a net value of $27,485. James received all of the remaining assets of the net marital estate, including the farmland, equipment, and other personal property, with a resulting net value of $182,227. In an attempt to make an equitable division of the property, the trial court ordered James to pay Gloria $46,000, secured by a mortgage on the land. The mortgage payments were to be amortized over a period of ten years at a six percent rate of interest.[2] The court calculated that James's total payments to Gloria would equal $73,600, thereby resulting in a final property award to Gloria of $101,085, and a final property award to James of $108,627. The trial court noted that Gloria's share would amount to "nearly one-half" of the $209,712 net estate.

On appeal, Gloria contends that the trial court erred in determining the value of the buildings on the farmland, the value of certain other minor pieces of personal property, and the amount of the payment to be made to her in order to make the distribution equitable. Gloria also argues that the trial court erred in denying her attorney's fees. We consider Gloria's arguments separately.

1. After Gloria had commenced this action, James again sought treatment for depression and was hospitalized for nearly one month prior to trial.

2. The trial court also included a prepayment provision in the mortgage. The provision prohibited prepayment by James for the first four years of the mortgage. The provision further provided that if James prepaid the obligation between the fourth and six year of the mort-

gage, he would be obligated to pay a $10,000 penalty. The trial court's prepayment provision is somewhat puzzling because it would be uneconomical for James to obtain a new loan at an interest rate which, in all probability, would far exceed six percent in order to pay off the six-percent mortgage. Indeed, if the provision was intended to protect Gloria's interest it appears she would, in view of current interest rates, benefit if there was a prepayment.

## PROPERTY DIVISION

It is well-settled that a trial court's determination on matters of property division are treated as findings of fact to be reviewed under the "clearly erroneous" standard of Rule 52(a), NDRCivP. *Freed v. Freed*, 454 N.W.2d 516 (N.D.1990); *Heggen v. Heggen*, 452 N.W.2d 96 (N.D.1990); *Bader v. Bader*, 448 N.W.2d 187 (N.D. 1989). A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Freed v. Freed, supra; Routledge v. Routledge*, 377 N.W.2d 542 (N.D.1985); *Hedin v. Hedin*, 370 N.W.2d 544 (N.D. 1985). Furthermore, this Court will not reverse a decision of the trial court merely because we may have viewed the evidence differently had it been presented to us initially as the trier of fact. *Williams v. Williams*, 302 N.W.2d 754 (N.D.1981).

Gloria first contends that, in determining the value of the net marital estate, the trial court erred in accepting James's expert's appraisal of the value of the farm buildings and improvements. During the trial, James's expert appraiser, Eugene Weekes, valued the farm buildings and improvements at $24,400, while Gloria's expert appraiser, Bill Knudson, valued the structures at $40,000. Knudson's appraisal partly relied upon one farm sale that had taken place after Weekes's appraisal which, Knudson testified, revealed that buildings and improvements contributed to the overall value of the farmland sold. Noting that the recent sale would not alone be sufficient to establish a trend, Knudson concluded that, when taken in conjunction with the other comparable sales used in his appraisal, farm buildings contribute significantly to the value of farmland. Weekes testified that in farm market trends of recent years, the contributory value of buildings and improvements to overall farmland valuation "is quite small." Weekes also indicated that one sale is not enough to establish a different trend and that his appraisal, which also utilized comparable sales, would not have changed as of the time of trial. The trial court specifically accepted Weekes' valuation, finding that Knudson employed "unacceptable" comparable sales in his appraisal.

This Court has ordinarily refused to overturn a trial court's findings when it was presented with conflicting testimony on an issue. In *Jochim v. Jochim*, 306 N.W.2d 196, 199 (N.D.1981), we stated:

"When there is conflicting testimony, the reviewing court will give considerable weight to the findings of the trial court because the trial court is able to see and hear the witnesses, and the reviewing court is not. [Citation omitted.] The judge at the trial court level is in a better position to accept one version of the facts over another because he is able to listen to and observe the demeanor of the witnesses, where this Court, bound by a cold reading of the transcript, cannot do so."

*See also Freed v. Freed, supra; Jondahl v. Jondahl*, 344 N.W.2d 63 (N.D.1984); *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980); *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979).

In the instant case, there was conflicting expert testimony as to whether buildings significantly add to the overall valuation of farmland, and whether Knudson's "recent" comparable sale, in conjunction with the other sales used in his appraisal, established such a trend. The trial court, which heard the testimony and had the opportunity to observe the manner of presentation and the demeanor and credibility of the appraisers, is in a far better position than an appellate court, which possesses only a cold record, to ascertain the true facts regarding the value of the structures and, accordingly, its findings will have considerable force on appeal when conflicting valuation testimony exists. We do not believe that it was clearly erroneous for the trial court to place greater weight or credibility upon Weekes's testimony and certified appraisal concerning the valuation of the buildings and improvements, nor are we left with a definite and firm conviction that a mistake has been made.

Gloria's second argument is that the trial court was clearly erroneous in its valuation of five relatively minor pieces of personal property. Again, however, there was often equivocal evidence and differing testimony presented to the trial court by James and Gloria regarding the value of these individual properties.[3] Upon reviewing the transcript, testimony, and the record, we also do not believe that the trial court was clearly erroneous in its personal property valuations.

■ Gloria's final property division issue concerns the mortgage on the farmland granted to her by the trial court in order to make an equitable distribution of the property. The trial court found that James's total principal and interest payments under the ten-year, six-percent interest, $46,000 mortgage would amount to $73,600, resulting in ten $7,360 annual installment payments over the life of the mortgage. After adding James's total mortgage payments to the other property Gloria received in the distribution, the trial court concluded that Gloria's final property award would equal $101,085, or "nearly one-half" of the parties' $209,712 net estate.

Initially, we note that this is not the type of case where a monetary lump-sum distribution was ordered paid in installments without interest, thereby requiring a present value determination of the monthly payments. *Compare Lucy v. Lucy*, 456 N.W.2d 539 (N.D.1990); *Tuff v. Tuff*, 333 N.W.2d 421 (N.D.1983). Rather, in this case the trial court specifically ordered James to pay six-percent interest in addi-

tion to the principal amount in his ten annual mortgage payments to Gloria. But we have not recognized that interest—required to be paid in order to avoid the inequitable distribution that would arise from a present-value distribution to one spouse and deferred distribution to the other spouse—also may be considered as part of the basic distribution to determine whether or not that distribution is equitable. To do so, particularly at an interest rate of six percent, is to disadvantage the payee, *i.e.*, the interest would be considered not only for the purpose of compensation for delay in receipt of the share of the marital estate, but also to increase the amount of the basic distribution to determine whether or not that distribution is equitable in the first instance. While interest at the rate of six percent may be used to avoid discounting the deferred payment to present value, it cannot, as here, be used to increase the amount of the basic distribution to determine if that distribution is equitable at the outset.

■ Furthermore, with regard to the mortgage amount, Gloria contends that the trial court's principal and interest calculation was erroneous, and that a correct amortization of a principal amount of $46,-000 in ten installments at six percent interest would yield a total principal and interest payment of only $62,500, or ten $6,250 annual payments. We agree. In arriving at its total payment amount of $73,600, the trial court apparently utilized a simple interest calculation which did not take into consideration the fact that James's annual

---

3. To illustrate, on the Rule 8.3, NDROC, property listing, Gloria listed one of the five disputed assets, a carpenter's union Individual Retirement Account (IRA), and gave it an "estimated" value of $1,000. James placed no value on the asset. During trial, Gloria testified that the carpenter's union had set up an IRA fund for its members, that she was "not definite" as to the amount, and that she was "guessing" as to its value. James testified that he "tried to find out" about the asset from the "local" union, that he received very little information from the local, and that he was "not sure" about any IRA amount. On the property listing, the trial court placed a $0.00 value beside the IRA along with an "H" notation indicating that it accepted the husband's value. The evidence and testimony

concerning the remaining four disputed assets were similarly equivocal and speculative.

This second issue presented by Gloria demonstrates the importance and value of giving considerable weight to the trial court's findings regarding property valuation because the trial court had the opportunity to hear James and Gloria's testimony, and to evaluate their credibility and demeanor when ascertaining the facts regarding the property's value. *Freed v. Freed*, 454 N.W.2d 516 (N.D.1990); *Jochim v. Jochim*, 306 N.W.2d 196 (N.D.1981). This Court, however, has nothing but a cold record before it and, accordingly, we are unwilling to second-guess the findings of the trial court which largely hinge upon matters of credibility and weight.

payments would decrease the outstanding principal balance over time, thereby resulting in lower yearly interest payments as the principal balance declines.[4] Gloria's correct mortgage computation demonstrates that she would actually receive approximately $11,100 less than the trial court's erroneous calculation.

This Court has often stated that property divisions do not necessarily have to be equal in order to be equitable. *See Volk v. Volk*, 404 N.W.2d 495 (N.D.1987); *Routledge v. Routledge, supra.* However, the trial court's findings indicated that Gloria would be receiving "nearly one-half" of the net marital estate, apparently demonstrating its belief that the property division should be nearly equal in order to be equitable. Because Gloria's final share of the marital property is substantially less due to the inclusion of interest and the erroneous mortgage calculation, we have serious doubts that the trial court would still find the property division to be equitable. Accordingly, we remand this case to the trial court for further findings and proceedings concerning the mortgage amount granted by the trial court to Gloria in order to make an equitable distribution of the parties' property.

## ATTORNEY'S FEES

■ Prior to trial, Gloria sought attorney's fees in connection with a motion to compel discovery pursuant to Rule 37, NDRCivP, contending that James's delay in responding to written interrogatories impeded the preparation and presentation of her case. The trial court denied Gloria's request for attorney's fees, finding that it "[did] not believe that plaintiff's counsel was hampered or hindered in her presentation of the case by the tardy responses to the discovery request." It is well settled that the trial court has very broad discretion in awarding sanctions for discovery abuses, and that its decision will not be set aside on appeal unless there is an abuse of discretion. *Dakota Bank & Trust Co. of Fargo v. Brakke*, 377 N.W.2d 553 (N.D. 1985); *Thompson v. Ziebarth*, 334 N.W.2d 192 (N.D.1983). Upon reviewing the record, we are not convinced that the trial court abused its discretion in denying Gloria's request for attorney's fees.

■ Gloria's complaint also sought the cost of her attorney's fees for the divorce action. *See* NDCC § 14–05–23. The trial court ordered the parties to pay their own attorney's fees. On appeal, Gloria contends that the trial court abused its discretion in denying her attorney's fees, arguing that she received very few liquid assets in the property distribution and that her attorney's fees would substantially reduce the value of the property she received pursuant to the judgment of divorce. Moreover, Gloria argues that even if the trial court did not err in determining she had sufficient assets to pay the fees, the evidence in the record demonstrates that James had actually paid his attorney's fees from the assets of the marital estate, while she paid her fees from her separate property award. Gloria asserts that the trial court should have at least granted her attorney's fees in the amount that she contributed toward the payment of James's attorney's fees paid from assets of the marital estate.

Because we remand this case to the trial court for further proceedings and findings concerning the mortgage payments to be made to Gloria, we need not decide Gloria's attorney's fee issues at this time because she will have the opportunity to present her "lack of liquid assets" argument to the trial court when it redetermines the mort-

---

4. The trial court determined the total simple interest on the mortgage utilizing the following calculation: $46,000 [mortgage principal] × 6% [interest rate] × 10 years [time or life of mortgage] = $27,600. The trial court then added the total simple interest of $27,600 to the mortgage principal of $46,000 in arriving at its total principal and interest calculation of $73,600. However, simple interest calculations do not take into consideration amortization principles, *i.e.*, that annual payments toward principal reduce the outstanding principal amount and, hence, result in lower interest payments as the principal balance declines over time. In order for the trial court to have arrived at a total principal and interest calculation of $73,600, it actually would have had to grant Gloria a mortgage in the amount of $54,170 at six percent interest, payable in ten installments.

gage payment amount and, hence, property distribution of the parties on remand. A determination on the award of attorney's fees should await that redetermination. Even if the trial court again finds, on remand, that the parties have sufficient assets to pay their own attorney's fees, we believe that the trial court should still consider Gloria's argument that James paid his fees from the marital assets, as it would be inequitable for Gloria to have actually contributed to a portion of James's attorney's fees.

The judgment is affirmed in part and remanded for further proceedings consistent with this opinion.

ERICKSTAD, C.J., and GIERKE, MESCHKE and LEVINE, JJ., concur.